180 N.J. Super. 440 (1981)
435 A.2d 562
CALDWELL-WEST CALDWELL EDUCATION ASSOCIATION, CHARGING PARTY-APPELLANT AND CROSS-RESPONDENT,
v.
CALDWELL-WEST CALDWELL BOARD OF EDUCATION, RESPONDENT-RESPONDENT AND CROSS-APPELLANT, AND PUBLIC EMPLOYMENT RELATIONS COMMISSION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 1981.
Decided August 7, 1981.
*442 Before Judges BOTTER, KING and McELROY.
Gerald M. Goldberg argued the cause for appellant (Goldberg & Simon, attorneys; Gregory T. Syrek, on the brief).
Lois M. Van Deusen argued the cause for respondent Board of Education (McCarter & English, attorneys; Federick B. Lehlbach, of counsel).
Sidney H. Lehmann, General Counsel, PERC, attorney for respondent PERC (Don Horowitz, Deputy General Counsel, on the brief).
The opinion of the court was delivered by BOTTER, P.J.A.D.
The Caldwell-West Caldwell Education Association (Association) appeals from a decision and order of the Public Employment Relations Commission (PERC) and the Caldwell-West Caldwell Board of Education (Board) cross-appeals.
The issues on the Association's appeal concern PERC's disposition of counts I, III and IV of the Association's amended unfair practice charge filed with PERC. Count I contains the charge that, commencing on September 1, 1976, the Board improperly increased the work hours and workload of seventh grade "CORE" teachers without negotiation. Count III charged the improper, unilateral elimination of a free period from the schedule of the Audio-Visual Aids Coordinator (the AV coordinator) commencing September 1, 1976. Count IV charged the improper reduction of employment and salary, from four weeks to two weeks, of the Cooperative Industrial Education Coordinator (the CIE coordinator) in the summer of 1976. With respect to count III, the Association contends that PERC erred in failing to make a monetary award for what PERC found to be the improper *443 removal of a free period from the schedule of the AV coordinator. The cross-appeal challenges PERC's conclusion that elimination of this free period without prior negotiation was an unfair labor practice in violation of the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq., N.J.S.A. 34:13A-5.3 and 5.4(a)(5).
We deal first with the issue concerning the change in teaching schedule for the seventh grade CORE teachers commencing September 1, 1976. The CORE educational program for seventh grade students was instituted around 1969. It was designed to ease the transition from the elementary school single teacher format to the high school departmentalized teaching format. The CORE program was a modified departmentalized system for seventh grade students that paired English and social studies as one block for 1 3/4 hours, and science and math in another similar block. The teachers of the separate instructional blocks worked together as a team to provide greater integration of subject matter and instructional flexibility. From 1971 to 1976 teachers in the CORE program were a relatively stable group with little turnover. CORE teachers during these years carried a uniform schedule of daily classroom instruction of 14 mods, 7 mods for each of the two instructional classes, plus at least 2 mods of supervisory duty and other mods of emergency coverage and preparation time. A "mod" refers to a 15-minute module of time for scheduling purposes. The workday for all teachers consisted of 24 mods (six hours), including a 2-mod (1/2 hour) duty-free lunch period. In addition to daily classroom instruction, teachers were assigned supervision of students in homeroom, lunchroom or study hall, emergency assignments primarily consisting of covering for absent or indisposed teachers, and nonsupervisory duties such as administering attendance records or school accounts. Some free time was also afforded which could be used for preparing and grading assignments, conferring with other teachers, as well as a teacher's personal affairs. Salary schedules were determined according to the length of service in the district as well as the number of graduate credits *444 and degrees earned, but did not depend upon professional assignments during the course of the workday.
On March 30, 1976, the Board voted to eliminate the foreign language program that had been taught previously to seventh grade and eighth grade students. The change was to become effective in the new school year beginning September 1, 1976. Reasons cited for the change included a budget defeat, which resulted in a reduction of teaching force, as well as educational considerations, since the desirability of the program had been questioned over the years. Because of the elimination of foreign language instruction, a 30-minute or 2-mod block of time became available in the schedule of each seventh grade student. The Board left it to the administrators of the junior high school to determine how to absorb this instructional time.
On April 8, 1976 the junior high school principal met with CORE teachers and advised them that there were several alternatives for using this time, namely, additional instruction time, study period time, a longer lunch period or a shorter school day. Of these the principal stated that he chose the most advantageous educational alternative by assigning one additional mod to reading and one to math within the existing CORE blocks. In exchange for increasing by two mods instructional class time for CORE teachers, two mods of lunchroom duty, i.e., cafeteria supervision, would be eliminated from their schedules. No new subjects were assigned to the CORE teachers, nor was the overall length of the day increased, and the 16 mods of in-class instruction fell within the 14- to 18-mod parameters established as the permissible, general workload. There was testimony that the course content did not increase but that the extension of each CORE block of time by 15 minutes increased the amount of work required by a teacher in terms of preparation for classroom instruction and paper work to the extent that the 15-minute increase in classroom time could result in more student papers to be read and graded.
*445 As a result of the proposed reduction in teaching staff, the elimination of the foreign language program and the claim of increased workload, the Association asked the Board to meet and negotiate these effects. The Board agreed to meet and discuss the effects of the reduction in work force, but refused to negotiate these effects. A meeting was held on May 10, 1976, at which time demands were made on behalf of the teachers to negotiate the contemplated changes. Negotiation was refused by the Board's representative because the school day was not lengthened and teachers were expected to perform within the existing mod structure which allowed for 14 to 18 assigned mods of instructional time a day. The meeting terminated without agreement on the Association's demands.
A few days before the meeting, CORE teachers filed a formal grievance over the unilateral increase in teaching time. This grievance was rejected by the Board in June 1976. The issue went to arbitration, but the arbitrator concluded that the issue was not arbitrable under the existing collective bargaining agreement. Accordingly, the Association sought relief in the PERC proceedings which led to this appeal.
The parties had entered into a collective agreement or contract for the 1975-1976 school year. Negotiations for a new collective agreement to succeed the one expiring on June 30, 1976 commenced in the fall of 1975. There is evidence in the record that during these negotiations the Association sought the assignment of personnel other than teachers for nonteaching duties and the elimination of cafeteria supervision, with this duty to be assumed by the employment of aides. The Association also sought to prevent the reduction in teaching staff and to provide certain rights for tenured and nontenured teachers in the event of such a reduction. A new agreement was reached on June 14, 1976 for the 1976-1977 school year, but none of the foregoing demands were incorporated in that agreement. The agreement was the outcome of negotiation sessions that were held as late as May and June of 1976. After arbitration of their grievance failed to satisfy the seventh grade CORE teachers, an *446 unfair practice charge was filed with PERC on December 27, 1976. An amended unfair practice charge was filed thereafter, in October 1977. Hearings commenced before a hearing examiner in January 1978 and were held intermittently until they concluded in September of that year. Briefs were thereafter filed, the hearing examiner issued a Recommended Report and Decision, exceptions were filed, and the matter was thereafter argued before PERC.
Disagreeing with the hearing examiner's recommendations, PERC ruled as a matter of law that the increase in workload for seventh grade CORE teachers found by the hearing examiner was a direct result of the reduction in force and elimination of the foreign language teacher for the 1976-1977 school year, and, accordingly, since the reduction in force was a managerial prerogative, the impact thereof was not negotiable. In support of that decision PERC cited In re Maywood Bd. of Ed., 168 N.J. Super. 45, 58 (App.Div.), cert. den. 81 N.J. 292 (1979). This decision antedated Woodstown-Pilesgrove Bd. of Ed. v. Woodstown-Pilesgrove Ed. Ass'n, 81 N.J. 582 (1980).
In Woodstown-Pilesgrove, the court held that if the dominant issue concerns an educational goal, it falls within the managerial prerogatives of a board of education and "there is no obligation to negotiate and subject the matter, including its impact, to binding arbitration." Id. at 591. The court stated:
It is only when the result of bargaining may significantly or substantially encroach upon the management prerogative that the duty to bargain must give way to the more pervasive need of educational policy decisions. [Id. at 593]
The dispute in Woodstown-Pilesgrove concerned two additional hours that the school teachers were required to work on the day before Thanksgiving. Previous past practice called for dismissing teachers and students at 1 p.m. on the day before Thanksgiving. The new calendar called for a school day ending at 3 p.m. The Board sought to impose the change during the school year. Thus, the question concerned payment for the additional hours of work required by this extension of one day before a holiday. In these circumstances the court found no "particularly *447 significant educational purpose" involved; it held that "the budgetary consideration being the dominant element, it cannot be said that negotiation and binding arbitration of that matter significantly or substantially trenched upon the managerial prerogative of the board of education." 81 N.J. at 594.
In the case at hand, the elimination of two mods a day of language instruction and the substitution of one mod of reading and one mod of math a day were unquestionably matters of educational policy falling entirely within the prerogatives of the Board. Accepting this, the Association argues that the change in teaching assignments by adding two mods of instruction a day could not be effected without prior negotiation since it changed a preexisting practice. The Association also contends that removing two mods of cafeteria supervision was not sufficient compensation for the increased workload.
In the circumstances of this case we conclude that the board of education did not engage in an unfair labor practice by failing to negotiate this change in teaching assignments. We note that the change in assignments did not include the lengthening of the school day and did not extend the teaching obligation of seventh grade CORE teachers beyond the 14- to 18-mod range which was common practice for all other teachers. Although the hearing examiner found that the separate practice established for CORE teachers could be considered independently of all other teachers, we do not find this a sufficient basis for limiting the flexibility and discretion that a board of education must have in shaping educational policies and fulfilling its educational obligations. The Board must have some flexibility in making managerial decisions. The concept of preexisting practices should not be so rigidly adhered to as to require negotiation of every minute deviation. Unless there is room in the joints for modification and adaptation necessary to make the system work, educational machinery would become stalled in endless dispute, grievance procedures, arbitration, unfair labor practice charges, hearings, reviews, and appeals. Here the issue *448 was whether a block of seven mods set aside for math and science and a like block of time set aside for English and social studies could each be extended one mod or 15 minutes a day in exchange for equivalent mods of cafeteria supervision duty. Being inspired primarily by an educational objective, a board of education should have sufficient discretion to make this change without prior negotiations so long as the change is not unduly burdensome.
Without some measure of flexibility constant battles would be waged over every change in format, with each change viewed as an opportunity to extract more concessions. Such disputation is especially unfortunate in this case since the parties were negotiating a general agreement for the year in which these changes occurred. Contemplated changes should be part of the group of proposals bundled together into one agreement, which in this case was reached in June 1976. In this respect the Board, in our view, was also remiss in standing on the proposition that the two mods change in instruction time could be discussed but not negotiated. Working hours are generally negotiable, Englewood Bd. of Ed. v. Englewood Teacher's Ass'n, 64 N.J. 1, 7-8 (1973), and the burdens of working should normally be considered a term and condition of employment. See In re Byram Tp. Bd. of Ed., 152 N.J. Super. 12 (App.Div. 1977). It is difficult to draw the line between a mandatorily negotiable effect of educational policy and those that are not negotiable. The presumption should be in favor of negotiating a change in working duties, and resolution of this disputed change should then be integrated in the agreement. The purpose of a new contract should be to package all pending changes in burdens and benefits. Fringe, residual disputes should not be maintained in orbit as in this case. The goal of the Employer-Employee Relations Act was to foster labor peace by compelling negotiation. N.J.S.A. 34:13A-2; cf. Galloway Tp. Bd. of Ed. v. Galloway Tp. Ass'n of Ed. Sec'ts, 78 N.J. 1, 16 (1978). Looking at the flood of grievances, arbitration, PERC proceedings and litigation it has spawned one wonders whether it has not inspired *449 more disputes by increasing the arsenal of weapons for waging legal battles.
Thus, we are impelled to rule that a change from preexisting practice which is directly related to an educational purpose should not be measured by caliper and micrometer. Boards of education must be given some room to manage between contracts without being forced to bargain over every move they make. There must be some rounding of the edges of contention. The business of providing education is not an assembly line operation with productivity measured in discrete product units for which an exact exchange of compensation can be given. Cooperation of both sides is needed to fulfill the public trust of educating the children of this state in the time that runs from collective negotiation agreement to collective negotiation agreement. Disputes of a relatively minor nature arising in the interim must be quelled, and the aggregate of minor grievances should be resolved by compensatory across-the-board allowances in the next contract.
The next unfair labor practice to be considered is the unilateral increase from 12 to 15 teaching mods assigned to the person who also held the extra-duty or extra-curricular position of Audio-Visual Aids Coordinator. There were many extra-curricular assignments in the junior high school. These were assumed or bid for voluntarily by the teachers on an annual basis, except that a teacher who had served satisfactorily in a position would normally be continued in the position until he or she wanted to give it up. The collective agreement provided extra compensation for each of the positions, the rates having been negotiated as part of the agreement.
In April 1971 Alan Davenport was offered the position of AV coordinator. The duties included storage of equipment, delivering and setting up the equipment in classrooms on request, requisition of equipment and software, providing information to teachers on free film availability, making minor repairs, keeping an inventory, etc. When offered the position Davenport was *450 told that he would have no cafeteria or homeroom duty and that, aside from his preparation period, he would have one other free period presumably for the performance of his A.V. duties. Thus, his instruction time was reduced from 15 mods to 12 mods for the 1971-1972 school year. This schedule continued through the 1975-1976 school year. In May 1976 Davenport was informed that his classroom teaching schedule was being increased from 12 to 15 mods, effective September 1976, the three additional mods replacing one free period in his schedule. No special salary adjustment was made for the extra-curricular position of AV coordinator in the contract for the 1976-1977 year. However, prior thereto, in May 1976, Davenport filed a formal grievance over the unilateral increase in teaching time. This grievance was rejected by the Board and went to arbitration. Arbitration failed to settle the dispute because the issue was found nonarbitrable under the collective agreement. The issue, then, was included in count three of the unfair practice charge filed with PERC.
There is a dispute as to the fairness of requiring the AV coordinator to carry a 15-mod teaching schedule. There was evidence that Davenport's predecessors carried 15- and 16-mod schedules, but there was also evidence that there were equipment increases and increases in responsibility during the years that Davenport held the position. The hearing examiner and PERC held that the governing practice would be measured during the years Davenport held the position and that any unilateral change in practice could not be made without prior negotiation. We disagree with this conclusion. The 15-mod teaching assignment was within the normal 14- to 18-mod range applicable to all teachers. Before accepting the AV coordinator's position for the 1976 school year, Davenport was informed of the new teaching schedule. He was not compelled to accept the position at the additional stipend provided in the collective agreement. Alternatively, if he intended to continue in the position, his representatives should have attempted to negotiate a higher additional stipend as part of the agreement rather than *451 simply file a grievance. Notwithstanding the dispute, Davenport signed a memorandum agreeing to perform as AV coordinator for the 1976-1977 year at $480 in addition to his normal compensation. We note, also, that there is no fixed amount of time required for the performance of the duties.
Having concluded that the Board did not commit an unfair practice in regard to the teaching assignment of the AV coordinator, we find in favor of the Board on its cross-appeal. This makes it unnecessary for us to consider the Association's contention on its appeal that PERC erred in failing to award Davenport compensatory damages for the time he spent in performing his new responsibilities. We note parenthetically that Davenport resigned from his position in late September 1976 for reasons not material here, and we would normally support PERC's discretion in denying a compensatory award for the short time involved. Cf. the Galloway Tp. case, supra, 78 N.J. at 16.
The last issue concerns PERC's holding that the Board did not have to negotiate a reduction in working time for summer employment offered to the CIE coordinator in 1976.
John Antolick had held the position of CIE coordinator since 1968. For each summer thereafter, including the summer of 1975, Antolick was employed for four weeks and was paid at the rate of one-tenth of his contractual salary for the ensuing year. His duties included visiting students on their jobs, counseling new students and visiting current and prospective employers. Each summer from 1968 to 1975 there were 10 to 12 students enrolled in the Cooperative Industrial Education program. However, only three students enrolled for the summer of 1976. Accordingly, Antolick was offered a two-week contract for that summer. Antolick filed a grievance and an arbitration hearing was held. The grievance was found to be arbitrable but was rejected on the merits since the reduction in the scope of summer employment was found to be analogous to layoff for lack of work in the private sector and thus within the Board's *452 management prerogative to reduce Antolick's summer work in light of the drastically reduced student enrollment. Notwithstanding the arbitration, the issue was presented to PERC. The Association's position was accepted by the hearing examiner who held that the arbitrator's decision was repugnant to the Employer-Employee Relations Act since it constituted a reduction of the length of the work year that could not be done without prior negotiation. PERC rejected this interpretation. PERC held that the CIE coordinator "was hired anew each summer for the program," and that decisions as to the "extent of the program and determinations as to hiring are totally for management and non-negotiable." We agree and affirm substantially for the reasons given by PERC. To say that the teacher must be hired for four weeks in the summer when his work could be done in two weeks because of the reduction in participating students would frustrate the essential duty of school boards to spend public funds wisely.
PERC's order with regard to counts one and four of the amended unfair practice charge is affirmed; that part of its order that deals with the teaching duties of the AV coordinator which was the subject of count three in the Board's cross-appeal is reversed and set aside. PERC's application for enforcement of its order in relation to count three is, therefore, denied.