IN THE MATTER OF HUNTERDON COUNTY BOARD OF CHO-
SEN FREEHOLDERS, APPELLANT, AND COMMUNICATIONS
WORKERS OF AMERICA, AFL–CIO, RESPONDENT.

Argued February 27, 1989—Decided August 9, 1989.

*Gaetano M. De Sapio* argued the cause for appellant.

*Steven P. Weissman,* Counsel, District One, argued the cause for respondent.

*Don Horowitz,* Deputy General Counsel, argued the cause for Public Employees' Relations Commission (*Robert E. Anderson,* General Counsel, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a public employer, a county board of freeholders, unilaterally imposed and later terminated a safety incentive program that included the award of cash bonuses to county road crew employees based on safe performance. The employees, through their union, a designated representative, took the position that the county's unilateral actions undertaken without meeting or negotiating with the union constituted unfair practices under the Employer–Employee Relations Act. The central question raised by this controversy and ensuing litigation is whether the implementation and termination of this safety-incentive program fell within the scope of matters that are mandatory subjects of collective negotiations under the Act.

## I.

On December 28, 1984, the Hunterdon County Engineer notified all employees of the Road and Bridge Department that the County Board of Chosen Freeholders ("County") had autho-

rized the implementation of a Safety Incentive Program. This program provided for cash awards of fifty to one-hundred dollars to members of road crews who, over the course of 1985, either reported no on-the-job injuries or suffered the least amount of time lost from work due to such mishaps.[1] Although the employees were represented by the Communication Workers of America, AFL–CIO ("Union"), the County neither consulted nor negotiated with the Union regarding the terms or implementation of this program. Further, the County did not provide the Union with any specific notice of the program.

On June 21, 1985, the Union filed an Unfair Practice Charge with Public Employment Relations Commission ("PERC"), alleging that the unilateral adoption of the safety-incentive

---

[1]The program announcement stated, in relevant part, that

[e]ffective January 1, 1985, the Board of Chosen Freeholders has authorized the implementation of a Safety Incentive Demonstration Program within the County Road and Bridge Department.

The objective of the program is to provide an incentive which will reduce on-the-job incidents which result in employees injuries, medical expenses and lost man hours.

The program envisioned is quite simple. As safety on the job site is a function of all the employees working there, it is important that evaluation will be made and the award given on a unit or crew basis. The evaluation period will be the Calendar year 1985.

1. The members of any crew which completes the calendar year without a reported incident of an on-the-job injury having been filed will be paid a cash award of $100.

2. The members of any crew which completes the year with an incident report but where the injury was so slight that it did not require further medical treatment nor result in absence from work will be paid a cash award of $50.

3. In the event that *no* crew finishes the year without a more serious or an injury which results in absence from work then the members of the crew having incidents amounting to the least lost time shall be paid a cash award of $50.

Where an employee is assigned from one crew to another, his time or incident will be prorated.

Hopefully, if the program appears to be effective, it may be continued in future years; perhaps with the support of our workmen's compensation carriers the program could be expanded.

program constituted the promulgation of terms and conditions of employment under which cash compensation might be paid and that this was a refusal to negotiate with the Union, the designated representative of public employees, and therefore a denial of rights guaranteed to represented employees under the Employer–Employee Relations Act ("Act"). The County responded by asserting that adoption of the awards program was authorized by statute, *N.J.S.A.* 40A:5–31 and *N.J.S.A.* 40A:9–18, thus exempting the County from any obligation to negotiate, and, further, that the program was not negotiable because it was not a term or condition of employment.

An exploratory conference between the parties held on October 28, 1985, was apparently unproductive, and, on November 12, 1985, the County voted to immediately terminate the safety-incentive program immediately notwithstanding its scheduled completion by the end of the year. On December 13, 1985, the Union amended its Unfair Practice Charge to allege that the program was terminated unilaterally in retaliation for the filing of the initial Unfair Practice charge. No employee received any cash award under the program.

In May 1985, PERC conducted a hearing. The Hearing Examiner concluded that the County violated the Act by unilaterally establishing and implementing the safety-incentive program without negotiating with the Union, but that the unilateral discontinuance of the program did not violate the Act. In September 1986, PERC affirmed the Hearing Officer's finding regarding the unilateral institution of the program, but also ruled that the Union had established a *prima facie* case that the termination of the safety-incentive program violated the Act. *Hunterdon County Bd. of Freeholders*, P.E.R.C. No. 87–35, 12 *NJPER* 768 (¶ 17293 1986). It remanded the matter to enable the County to rebut the *prima facie* case or establish that the termination of the program occurred for legitimate reasons.

On remand, the Hearing Examiner found that the County's failure to establish any legitimate business justification for the unilateral termination of the safety-incentive program offended the Act, and recommended that PERC order the County to cease and desist from violative conduct and to make payments to eligible employees on a *pro rata* basis from January 1, 1985, through November 12, 1985, along with 9.5% interest accruing from July 1, 1985. PERC affirmed the recommendation but modified the suggested remedy by ordering the County to calculate outstanding award payments for the entire calendar year of 1985, with statutory interest to accrue from January 15, 1986. *Hunterdon County Bd. of Freeholders*, P.E.R.C. No. 87–150, 13 *NJPER* 506 (¶ 18188 1987).

The County appealed. In an unpublished *per curiam* opinion, the Appellate Division affirmed the PERC decisions. There being a dissent, the County appealed as of right pursuant to *Rule* 2:2–1(a)(2).

## II.

Public employees are given comprehensive rights under the Employer–Employee Relations Act. *N.J.S.A.* 34:13A–5.3 states in pertinent part:

> A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit and shall be responsible for representing the interest of all such employees without discrimination and without regard to employee organization membership. Proposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established. In addition, the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances, disciplinary disputes, and other terms and conditions of employment. Nothing herein shall be construed as permitting negotiation of the standards or criteria for employee performance.

The Act imposes specific prohibitions against public employers in order to maximize the protections accorded public employees. Public employers are expressly "prohibited from ... [i]nterfering with, restraining or coercing employees in the exercise of

the rights guaranteed to them" under the Act. *N.J.S.A.* 34:13A–5.4(a)(1). Further, public employers are prohibited from

[r]efusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment of employees in that unit ... [*N.J.S.A.* 34:13A–5.4(a)(5).]

It must also be emphasized that the judicial role in this kind of case must be both sensitive and circumspect. We deal here with the regulatory determination of an administrative agency that is invested by the Legislature with broad authority and wide discretion in a highly specialized area of public life. PERC is empowered to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration including ... to implement fully all the provisions of [the] act." *N.J.S.A.* 34:13A–5.2. These manifestations of legislative intent indicate not only the responsibility and trust accorded to PERC, but also a high degree of confidence in the ability of PERC to use expertise and knowledge of circumstances and dynamics that are typical or unique to the realm of employer-employee relations in the public sector.

Although constitutional concerns or the dictates of legislative intent have at times compelled us to decline adoption of doctrines or statutory interpretations that have been favored by PERC, *see, e.g., Paterson Police PBA v. Paterson,* 87 *N.J.* 78, 91 (1981), in the absence of such constraints, and particularly in situations where agency expertise is essential towards understanding the proper context of a dispute, a deferential standard of review is appropriate. *See, e.g., Galloway Township Bd. of Educ. v. Galloway Township Ass'n of Educ. Secretaries,* 78 *N.J.* 1 (1978).

The Legislature has authorized PERC to determine in the first instance whether or not a "matter in dispute is within the scope of collective negotiations." *N.J.S.A.* 34:13A–5.4(d). The standard for review of a PERC decision in a representation

proceeding under *N.J.S.A.* 34:13A–6(d) is therefore equally applicable in a case involving the scope of negotiations:

> The role of judicial review [concerning the reasonableness of a *quasi*-Legislative policy decision pursuant to duly-delegated authority] is thoroughly settled. The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious.... This is the same rule as applies to judicial review of bargaining unit determinations by the National Labor Relations Board.... Moreover, where, as here, a substantial element of agency expertise is implicated, due weight should be accorded thereto on judicial review. [*State v. Professional Ass'n of N.J. Dep't of Education*, 64 *N.J.* 231, 258–59 (1974) (citations omitted).]

Likewise, the scope of our review of PERC's factual determinations is limited; the evaluation of evidence is the province of PERC rather than of the courts, and when these determinations fall within PERC's special sphere of expertise, we accord them due weight. *In re Bridgewater Township*, 95 *N.J.* 235, 245 (1984).

Both PERC and the Appellate Division determined that unilateral implementation of the safety incentive program involved the proposal of new rules or modification of existing rules governing working conditions, and because the program was established without negotiations with the Union, this failure of the County to "meet at reasonable times and negotiate in good faith with respect to ... terms and conditions of employment" violated *N.J.S.A.* 34:13A–5.3. This conduct, therefore, constituted unfair practices contrary to the express prohibition of *N.J.S.A.* 34:13A–5.4a(1) and (5). The Appellate Division dissent disagreed, believing that the County had no obligation to negotiate over the implementation or terms of the program.

As noted by each of the parties, *In re IFPTE Local 195 v. State*, 88 *N.J.* 393 (1982), details our basic test for the negotiability of subjects between public employers and employees:

> [A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and

the public employer. When the dominant concern is the government's manage-
rial prerogative to determine policy, a subject may not be included in collective
negotiations even though it may intimately affect employees' working condi-
tions. [*Id.* at 404–05.]

■ The County contends initially that its safety-incentive
program is a "subject [that] has been fully or partially preempt-
ed by statute." It argues that *N.J.S.A.* 40A:5–31 and 40A:9–18
are such preemptive statutes, giving it authority to adopt the
safety-incentive program unencumbered by any need to discuss
or negotiate the program with its employees.

The issue, however, is not whether these statutes, *N.J.S.A.*
40A:5–31 and 40A:9–18, authorize the County to adopt a safety-
incentive program, but whether they exempt the County from
negotiating with the Union over any of its provisions.

The preemption test governing the resolution of this kind of
issue was articulated in *Bethlehem Township Bd. of Educ. v.
Bethlehem Township Educ. Ass'n,* 91 *N.J.* 38, 44 (1982):

As a general rule, an otherwise negotiable topic cannot be the subject of a
negotiated agreement if it is preempted by legislation. However, the mere
existence of legislation relating to a given term or condition of employment
does not automatically preclude negotiations. Negotiation is preempted only if
the regulation fixes a term and condition of employment "expressly, specifically
and comprehensively," *Council [of New Jersey State College Locals v. State
Board of Higher Education ]* 91 *N.J.* [18] at 30. The legislative provision must
"speak in the imperative and leave nothing to the discretion of the public
employer." *In re IFPTE Local 195 v. State,* 88 *N.J.* 393, 403–04 (1982), quoting
*State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 80 (1978). If the
legislation, which encompasses agency regulations, contemplated discretionary
limits or sets a minimum or maximum term or condition, then negotiation will
be confined within these limits. *Id.* at 80–82. See *N.J.S.A.* 34:13A–8.1. Thus,
the rule established is that legislation "which expressly set[s] terms and
conditions of employment ... for public employees may not be contravened by
negotiated agreement." *State Supervisory,* 78 *N.J.* at 80.

Examination of *N.J.S.A.* 40A:5–31 and 40A:9–18, the enact-
ment of which predates recognition and establishment of nego-
tiation rights under the Employer–Employee Relations Act,
reveals that these statutes are not preemptive of public employ-
ees' rights of negotiation with respect to certain aspects of such
programs.

These statutes provide that local governmental entities and counties may establish and maintain plans for awards programs for employees "designed to promote efficiency and economy in government functions," and "to reward individual[s]" with awards in the form of cash, medals, certificates, insignia, or other appropriate devices or tokens of appreciation. The statutes neither "expressly, specifically and comprehensively" fix any term or condition of employment, nor do they "speak in the imperative and leave nothing to the discretion of the employer." The statutes authorize municipal and county officials to exercise discretion in choosing to institute awards or incentive programs, but contain no statutory limitation on how such discretion must be exercised with respect to the economic provisions of such a program or its impact on general working conditions. It is clear that the duty to negotiate over such matters is not excused through statutory preemption.

■ The County also argues that the program, aside from its asserted statutory immunity from negotiation, is non-negotiable because it does not sufficiently implicate the "terms and conditions" of employment, and, further, it does not "intimately and directly affect[ ] the work and welfare of public employees." *In re IFPTE Local 195, supra,* 88 *N.J.* at 403–04. The County thus stresses that economic considerations are inapplicable because no money was awarded prior to the unilateral termination of the program, and, in addition, the program did not impose any additional duties or overtly change existing workplace practices, demonstrating, along with the continuing expectation that workers will act to avoid on-the-job accidents, that the incentive program did not affect the welfare or work conditions of employees.

It is clear that employer actions that arguably affect compensation may be mandatorily negotiable. Although the clearest example of such effects is provided when the disputed actions concerns rates of pay and working hours, *see, e.g., In re IFPTE Local 195 v. State, supra,* 88 *N.J.* at 403; *Bd. of Educ.*

*Woodstown–Pilesgrove Regional School District v. Woodstown–Pilesgrove Educ. Ass'n,* 81 *N.J.* 582, 589 (1980), our courts have upheld findings by PERC that modest amounts of compensation, or even seemingly minor non-economic benefits, can sufficiently affect the work and welfare of employees to trigger mandatory negotiability. *See, e.g., In re Byram Township Bd. of Educ.,* 152 *N.J.Super.* 12 (App.Div.1977) (mandatory negotiability of proposed pay phone, mirror and shelf in teacher's lounge); *Bridgeton Educ. Ass'n v. Bridgeton Bd. of Educ.,* 132 *N.J. Super.* 554 (Ch.Div.1975) (unilateral withdrawal of $100 stipend to certified special education teachers violated Act).

The Appellate Division dissent believed the possible maximum award payment of $100 under the program to be a "token" sum that is insufficient to actuate any duty to negotiate. However, PERC found that it was "not prepared to say that annual payments of between $50 and $100 are only tokens." *Hunterdon County, supra,* 12 *NJPER* at 771. Given the unique ability of PERC to make such a determination, we are not inclined to find otherwise.

The County, as noted, states that the program imposed no alteration in workplace rules and therefore did not directly affect employee work and welfare. The record, however, reflects that employees were concerned that the measurement of injuries on a per-crew basis might lead crew members to pressure individuals to conceal ostensibly minor workplace injuries in order not to jeopardize the award eligibility of the entire group. Such concerns clearly implicate employee welfare. In prior cases, PERC has found that in the absence of issues demonstrably affecting governmental policy, employee safety is mandatorily negotiable. *See, e.g., State of New Jersey,* P.E.R.C., No. 86–11, 11 *NJPER* 457 (¶ 16162 1985).

The County contends that a negotiated agreement involving its safety-incentive program would significantly interfere with the determination of governmental policy, a process that re-

quires balancing of the interests of the public employees and employers. *In re IFPTE Local 195 v. State, supra,* 88 *N.J.* at 404–05. The County asserts that its interests include not only the promotion of workplace safety, but also, under *N.J.S.A.* 40A:5–31 and 40:9–18, the ability to choose whether to reward safe employees and to choose which employees to honor, and that it should be able to pursue these interests without "miring" the awards process in the time and effort required by the "public spectacle" of negotiation.

█ In finding that the potential award payments "intimately and directly affect the work and welfare of public employees and do not significantly interfere with the determination of government policy," *Hunterdon County, supra,* 12 *NJPER* at 771, PERC compared the safety-incentive program with determination of the negotiability of a program that offered increased payments in return for meritorious service, citing *County of Essex,* P.E.R.C. No. 86–149, 12 *NJPER* 536 (¶ 17201 1986) ("[t]he employees' interest in negotiating compensation as part of a viable negotiations process outweighs the employer's interest in deciding unilaterally who should receive merit/increments [in that] case."). Although the amount of compensation at issue in *County of Essex* exceeds the amount at stake in this case, PERC did not abuse its discretion in striking the balance between the competing interests of the County and its road-crew employees. The record reflects not only articulated employee concern with the effects of the program on actual safety, but also with the manner in which employees might be selected for awards.[2] Given the legitimacy of these concerns, it is clear that the governmental interests advanced by the Coun-

---

[2]The record reflects that employee concerns included the status of workers who floated from crew-to-crew, the status of inside maintenance people, the attribution of injuries caused by such uncontrollable circumstances as moving cars on the road, and penalization through injuries suffered by crew members while the affected individual is on vacation.

ty for maintaining non-negotiability do not outweigh the employee interests.

Accordingly, we uphold the determination by PERC and the Appellate Division that unilateral implementation of this safety-incentive program violated *N.J.S.A.* 34:13A–5.4a(1) and (5) by failing to recognize the duty to negotiate over such a program that arises under *N.J.S.A.* 34:13A–5.3.

### III.

■ Somewhat different considerations are raised by the additional issue of whether PERC and the Appellate Division were correct in determining that the unilateral termination of the safety incentive program violated *N.J.S.A.* 34:13A–5.4a(1), (3), (4) and (5). The critical aspect of this issue is whether the conduct of the County is impermissibe because it was "retaliatory."

In arguing that the unilateral withdrawal of the program was not retaliatory, the County maintains that the desire to "avoid the necessity of protracted negotiations over such a minor aspect of the County's affairs" constitutes a legitimate business justification for unilateral termination of the program. In support of this contention, the County contends that the agenda discussed by the Union during the October 28, 1985, conference evidenced its purpose to discuss non-negotiable matters extending beyond the economic component of the program. It is also argued that termination prior to the end of the incentive program period constituted a return to the *status quo* prior to implementation of the program, and that in the absence of any actual exchange of cash awards or overt change in work conditions, the "harm" of completing the un-negotiated program was avoided.

■ While what occurred at this October meeting is the subject of dispute, PERC took a different view of the matter from that urged by the County. PERC determined on the record that the Union had established a *prima facie* showing of

retaliatory motive in violation of *N.J.S.A.* 34:13A–5.4a(3) and (4). 12 *NJPER* at 771. In doing so, PERC applied the standard used by this Court in *In re Bridgewater Township, supra,* 95 *N.J.* at 246: "in the absence of any direct evidence of anti-union motivation for disciplinary action, a *prima facie* case must be established by showing that the employee engaged in protected activity, that the employer knew of this activity, and that the employer was hostile toward the exercise of the protected rights." We have found the use of this test, derived from the National Labor Relations Board decision in *Wright Line,* 251 *NLRB* 1083 (1980), to be "sound, balanced and fair to both sides" in situations where anti-union animus must be detected in dual-motivation situations. *COTA v. Molinelli Farms,* 114 *N.J.* 87, 100–01 (1989). We thus approve PERC's use of this test in the present context.

The record following the remand supports the findings of the Hearing Examiner, subsequently upheld by PERC, that the employees were engaged in a protected activity: seeking to discuss, and so they hoped to negotiate, a program implicating terms and conditions of their employment. Further, there is support for the finding that the County was unable to present a legitimate business reason sufficient to rebut the *prima facie* case of anti-union animus. There was nothing to suggest that the County was displeased with the program; there was, more-over, no basis for the County to conclude that the Union wanted the program terminated as opposed to wanting to participate in its development.[3] Nevertheless, despite a request by the Union, after the Union filed its unfair practice charge, that the

---

[3]The Hearing Examiner also noted the testimony offered by Freeholder George Melick in justification for termination of the program:

Well, we were—seemed to have quite a lot of problems with the union in litigation. It was time consuming on both our parts, County Counsel's time, our union representatives leaving work coming down here testifying all this stuff. So, if they don't want the program, we'll just terminate it. That'll solve the litigation, and everybody can go back to work, that's what we are all there for. [13 *NJPER* at 507.]

program run to term through 1985, the program was terminated shortly before the program would have ended and yielded awards to eligible workers. 13 *NJPER* at 231. Further, the County provided no notice prior to termination that indicated contemplation of closing the program. PERC was similarly unimpressed with the County's contention that unilateral termination of the program was a prophylactic measure intended to restore the *status quo ante* between the parties and avoid the "harm" of actually awarding any cash to employees under the incentive program.

The County also argues that the remedy ordered by PERC, payment of award money to those employees who would have qualified under the terms of the program for 1985, is erroneous because it not only provides for payment to workers who did not sustain any actual loss through unilateral termination of the program, but also allows PERC to usurp the role of the Freeholders in determining whom to reward.

In *Galloway Township Bd. of Educ., supra,* 78 *N.J.* at 16, we held that "under *N.J.S.A.* 34:13A–5.4(c), PERC possesses the authority to order that a party found to have violated the Act make the affected employees whole for their losses sustained by reason of the commission of an unfair practice in violation of *N.J.S.A.* 34:13A–5.4(a) and (b) through the payment of back pay." In arriving at this determination, we noted that

[i]n order to eliminate any possible claim that illustrative examples of permissible remedies excluded any remedies not so specified, the Legislature apparently decided to rely solely on *N.J.S.A.* 34:13A–5.4(c)'s general mandate that PERC could order "such reasonable affirmative action as will effectuate the policies" of the Act in order to provide the administrative agency with the desired remedial flexibility. In light of both the federal experience and our adjudications involving the Law Against Discrimination, we may fairly assume that the Legislature took the cautious route in formulating *N.J.S.A.* 34:13A–5.4(c), confident that its broad grant of authority therein would be sufficient to sanction all PERC remedial orders which meet the statutory test of reasonable effectuation of the Act's purpose. *See N.J.S.A.* 34:13A–5.4(f). [*Id.* at 15.]

In light of this experience, we affirm so much of the Appellate Division's judgment as affirmed PERC's rejection of the County's defense that unilateral termination merely returned

the parties to the *status quo ante*. PERC noted that both unilateral implementation and termination of the program were antithetical to the statutory duty to negotiate, and went on to hold that "an employer which unilaterally grants favorable benefits contrary to its statutory duty to negotiate may not unilaterally terminate such benefits absent a request to do so by the union; rather, it is obligated to negotiate with the union before again unilaterally changing such benefits." *Hunterdon County, supra*, 12 *NJPER* at 772. This holding parallels long-established practice under the National Labor Relations Act, *see, e.g., NLRB v. Keystone Steel & Wire, Div. of Keystone Consol. Indus., Inc.*, 653 *F.*2d 304, 308 (7th Cir.1981). Application of this doctrine is appropriate in this case. "[T]he 'experience and adjudications' under the [National Labor Relations Act] may appropriately guide the interpretation of the provisions of the New Jersey statutory scheme." *Galloway Twp. Bd. of Educ., supra*, 78 *N.J.* at 9; *Lullo v. International Ass'n of Fire Fighters*, 55 *N.J.* 409 (1970).

## IV.

This case, depending on one's vantage point, could be viewed either as a mountain or a molehill. Although the subject matter of this case may at first appear *de minimis*, we should remain mindful that this dispute is symptomatic of more important issues. This case bespeaks the failure by each of the parties to comprehend or realize the larger goals of the Employer–Employee Relations Act.

Although the Union acted within its clear right to file an unfair practice charge challenging the implementation of the incentive program without prior negotiation, the record of this case suggests that the Union might successfully have acted more promptly and taken a less-confrontational approach to this matter. Although the Union raised a number of substantive concerns about the program, it appears that the emphasis was on the need to negotiate rather than the content of these other

immediate issues. It thus not only threw down a gauntlet, it lost an opportunity to continue and develop a constructive program. On the other hand, in picking up the gauntlet, the County sacrificed a program that had much merit.

It is important to recognize that the *process* of negotiation serves an important role in effectuating the promotion of "permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State." *N.J.S.A.* 34:13A–2; *see Caldwell–W. Caldwell Educ. Ass'n v. Caldwell–W. Caldwell Bd. of Educ.*, 180 *N.J.Super.* 440, 448 (App.Div.1981). This process should ideally lead to communication and understanding between the parties rather than itself becoming the subject of dispute. Given the importance of preserving legitimate managerial prerogatives in the public sector that concern governmental functions, it is understandable that negotiability of particular issues is often subject to dispute; however, the frequency of such disputes might be reduced by a proper understanding of the nature and function of the negotiation process. The right to negotiate does not create an obligation to agree to a particular proposal or give one party any veto power over proposals of the other. An employer may adhere firmly to a good-faith negotiation position. *State v. Council of N.J. State College Locals*, 141 *N.J. Super.* 470 (App.Div.1976).

It is evident that aside from the legal issues that we are impelled to consider, this controversy has arisen because an of apparent inability to *communicate.* The County had a good idea intended to promote both the interests of the employees themselves and the greater public interest in reduced losses through workplace accidents. The employees certainly wished to reap the proffered benefits, but also had legitimate concerns about the economic and safety-related effects of the program and their right to participate in the development of these aspects of the program. It is unfortunate that the effort to communicate these concerns eventually led the parties before this Court. We trust that in the future, these parties, and

others similarly situated, can better manage to effectuate the goals of the Employer–Employee Relations Act and strive for the improved welfare of all citizens of our state by sincerely attempting to communicate with each other before resorting to the procedural weapons provided by the labor-relations process.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring in part and dissenting in part.

I am in accord with that portion of the majority opinion holding that unilateral implementation of the safety-incentive program violated *N.J.S.A.* 34:13A–5.4a(1) and (5). I do not agree with the Court's conclusion that the record in this case supports PERC's conclusion that the County had not presented a legitimate business reason for terminating the program. On this issue, I find most persuasive the initial determination of the Hearing Examiner who, although subsequently reversed by PERC, found that it "strains credulity" to conclude that the County's termination of the program was attributable to anti-union animus:

> [T]he Hearing Examiner has considered as probative the testimony of Kaufman as to what transpired at the exploratory conference on October 28th. However, the Hearing Examiner has concluded that even if the testimony of Kaufman is taken at face value, CWA has failed to establish the occurrence of any subsequent events which might causally connect the demands or requests made by Kaufman on October 28th to the County's decision to terminate the Program on November 12, 1985, "effective immediately." As previously found, the Hearing Examiner is not persuaded that the County at any time manifested any anti-union animus towards CWA in the course of the establishment and continuance of the Program and, thus, not only is there no violation of the § 5.4(a)(3) of the Act involved but there has been no violation by the County of § 5.4(a)(4) of the Act. It strains credulity to reach a contrary conclusion given the stipulated facts and the testimony of Kaufman.

Despite contrary findings by the Hearing Examiner after PERC's initial decision and remand, I am unpersuaded that the evidence in the record establishes anything more than a reasonable governmental decision by the Board of Freeholders to terminate an incentive program that the union opposed, not to retaliate for their opposition, but to avoid a costly and pro-

longed controversy over a relatively unimportant awards program. I am persuaded that the Hearing Examiner had this right the first time, when he granted the County's motion to dismiss the charges relating to termination of the awards program.

STEIN and GARIBALDI, JJ., concurring in part and dissenting in part.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK and O'HERN—4.