Justice HOENS,
dissenting.
There is much in the opinion issued by my colleagues in the majority with which I agree. In particular, I agree with the majority that the remedy created by this Court as a way to address exclusionary zoning policies that it found to be unconstitutional, see S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II), 92 N.J. 158, 204-05, 456 A.2d 390 (1983) (citing & Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel I), 67 N.J. 151, 174, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975)), and that the Legislature essentially embodied in the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329.4, is not the only constitutionally permissible method for achieving the goal of providing affordable housing.
Like the majority, I agree that the past three decades of experience do not mean that there can be no other way to “produefe] significant numbers of low- and moderate-income housing” nor does that experience suggest that there are no other potential ways to do so “consistent with statewide planning principles, present space availability, and economic conditions.” Ante at 585, 74 A.3d at 896-97. Moreover, like my colleagues in the majority, I agree that the remedy that this Court created and “imposed thirty years ago should not be viewed as a constitutional straightjacket to legislative innovation!., j” Ante at 620, 74 A.3d at 918.
Indeed, I applaud the majority for its willingness not only to recognize that there may be other ways to meet the mandate of Mount Laurel II, but for actively and forcefully encouraging the Legislature to explore new and innovative methods of “curb[ingj exclusionary zoning and promoting] the development of affordable housing!.]” Ante at 612, 74 A.3d at 913.
*622 I write in dissént, however, because, notwithstanding those broad and sweeping pronouncements, the majority’s analysis of the approach taken by COAH in the Third Round Rules, and therefore the majority’s holding, is flawed. As a result, the Court needlessly demands, as its remedy, rigid adherence to the very policies of the past that the majority simultaneously denounces as a “straightjacket[.]” Ante at 619, 74 A3d at 917.
In the end, although my colleagues in the majority invite the Legislature to chart a new path, their conclusion that the Third Round Rules adopted by COAH are inconsistent with the dictates of the FHA, and their further directive that strict adherence to the methodology of the earlier rounds is the only permissible remedy, leave the Legislature with no guidance concerning what alternate statutory approach might comply with the majority’s interpretation of the Constitution. That lack of guidance, perhaps unintentionally, will greatly diminish the likelihood that the Legislature will attempt a future change of course.
Were that my only disagreement with the majority, it would not have prompted this dissent. On the contrary, were it true that the Third Round Rules fall so far short of adherence to the FHA that they cannot stand, I would gladly join my colleagues. But they do not. Instead, as I see it, the Growth Share approach utilized in the Third Round Rules is consistent with both the constitutional mandates of Mount Laurel II and with the dictates of the FHA.
Moreover, if, as the majority concludes, the Third Round Rules lack a sufficient focus on regional needs to meet the majority’s interpretation of what the FHA requires, it would be far wiser, and more in keeping with our traditional manner of addressing challenges to administrative agency actions, for this Court to direct COAH to make that minor adjustment rather than to toss aside years of effort and force COAH to don the old straightjacket and rewrite the regulations to mirror those the Court approved in earlier rounds.
*623 I base my disagreement, and therefore my dissent, on what I believe to be two flaws in the majority’s analytical approach, which, taken together, have led the majority to impose upon COAH a remedy that is both unnecessary and inappropriate.
I.
First, the statutory construction on which the opinion is based is flawed because the majority has read its view of what the FHA should say into the language that the Legislature chose. That is, instead of considering the language that the Legislature used when declaring its purpose and instead of interpreting the operative sections of the statute in context, the majority has focused narrowly on references to regional approaches. More to the point, in maintaining that narrow focus, the majority has divorced those references from immediately surrounding words that permit a municipal, rather than regional, approach and has ignored the broad statutory language that tethers COAH’s role to sound planning principles.
The majority’s error is not in its explanation of the history of Mount Laurel I and Mount Laurel II, all of which is fully, faithfully, and carefully recounted. Nor does the error lie in the majority’s recitation of the essential facts that led this Court to mandate a solution, borne of frustration at the failure of the other branches of government to achieve a way to end unconstitutional exclusionary zoning practices. Nor is it controversial to observe that the Legislature enacted the FHA at the direction of, and to be consistent with, this Court’s requirements in Mount Laurel II.
The FHA, however, bespeaks a more dynamic approach than the one that the majority sees when reading the statute solely through its Mount Laurel II lens. Indeed, only by reading the FHA with the language of the Court in Mount Laurel II in mind, can the majority conclude that there is no room in that statute for the regulatory approach that COAH has adopted in the Third Round Rules. Using standard tools of statutory construction, however, yields a different result.
*624 When called upon to interpret the Legislature’s intent, few tools are as helpful as the Legislature’s own expression thereof. The FHA, as an example, includes just such language in the Legislature’s statement of its findings, which my colleagues have overlooked, but which is of enormous assistance in the task assigned. Principal among the findings included by the Legislature in the FHA is the expression of that body’s understanding of the meaning of Mount Laurel I and Mount Laurel II. The Legislature declared:
The New Jersey Supreme Court, through its rulings in [Mount Laurel /] and [Mount Laurel II ], has determined that every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region’s present and prospective needs for housing for low and moderate income families.
[N.J.S.A. 52:27D-302(a) (emphasis added).]
That expression is entirely faithful to the historical context in which the dispute over low and moderate income housing arose. The Mount Laurel litigation had its roots in a geographic area of the state in which growth in both housing and population was taking place, but where that growth was being artificially burdened by an exclusionary zoning scheme. See Mount Laurel I, supra, 67 N.J. at 161-64, 336 A.2d 713. It was not the growth or lack of growth that created the constitutional crisis; it was the manner in which the municipality attempted to divert low and moderate income families away from wealthier areas in the municipality when growing. See id. at 169-70, 336 A.2d 713.
That is not to say that the Legislature made no reference to regional concerns in the FHA, indeed it did, see N.J.S.A. 52:27D-302(e) (referring to regional need in terms of way in which low and moderate housing may be maximized), as had this Court in the Mount Laurel II opinion, see Mount Laurel II, supra, 92 N.J. at 213, 237-38, 456 A.2d 390 (recognizing that “zoning in accordance with regional considerations is not only permissible, it is mandated”).
But the expressed focus of the Legislature was on growth areas, as a result of which the FHA leaves open the route that COAH, in *625 adopting a Growth Share approach, utilized in the Third Round Rules. If, as I understand it, the Legislature intended to embrace the concept that growth, to the extent that it is occurring, may not be exclusionary, then the Growth Share model adopted by COAH in the Third Round Rules advances that goal and is entirely consistent with the FHA.
My colleagues in the majority, however, read into the FHA their own view of how growth should be channeled, finding a requirement that regional considerations predominate to the exclusion of municipal concerns. There are two shortcomings with that approach.
For one thing, in addition to being inconsistent with the context of the Mount Laurel litigation and the expression of the Legislature in its findings, see N.J.S.A. 52:27D-302(a), it is not faithful to the statutory text. Notably, in the majority’s quotation from the FHA that is intended to prove the point that the statute is largely based on regional concerns, the opinion underscores the words that tend to support that conclusion while ignoring the words “or a municipality” that follow. Ante at 613, 74 A.3d at 913 (reciting definition of “prospective need” and quoting N.J.S.A. 52:27D-304(j) with partial emphasis).
For another thing, that approach, and the conclusion that only the regulations from the prior rounds that this Court has previously approved will suffice, creates a never-ending cycle of forced growth everywhere. It does that by requiring COAH to project what regional needs will be and then by demanding that COAH force municipalities to comply with those projections in an endless, self-fulfilling prophesy of sprawl.
Unlike my colleagues, I see different principles at work in the statute that the Legislature enacted. The FHA is fundamentally based on concepts that professional planners have long embraced, requiring that COAH consider them in its evaluation of housing obligations.
*626 The reliance on sound planning principles so permeates the FHA that only a few examples are needed to prove the point. The Legislature included references to the need to revitalize our urban areas through “construction, conversion and rehabilitation of housing in our urban centers[, which] should be encouraged.” N.J.S.A. 52:27D-302(g). It included those concepts when it directed COAH to adopt criteria and guidelines:
Municipal adjustment of the present and prospective fair share based upon available vacant and developable land, infrastructure considerations or environmental or historic preservation factors and adjustments shall be made whenever:
(a) The preservation of historically or important architecture and sites and their environs or environmentally sensitive lands may be jeopardized,
(b) The established pattern of development in the community would be drastically altered,
(c) Adequate land for recreational, conservation or agricultural and farmland preservation purposes would not be provided,
(d) Adequate open space would not be provided,
(e) The pattern of development is contrary to the planning designations in the State Development and Redevelopment Plan ...,
(D Vacant and developable land is not available in the municipality, and
(g) Adequate public facilities and infrastructure capacities are not available, or would result in costs prohibitive to the public if provided.
[N.J.S.A. 52:27D-307(c)(2).]
Each of those concerns is directly derived from sound planning principles; each makes clear that the Legislature’s intent was not simply to comply with this Court’s view of how low and moderate income housing would best be created in accordance with the Constitution. Instead, the Legislature was trying to ensure that there would be careful recognition of the need to embrace sound planning principles generally.
Nor was COAH directed to perform its duties in some purely mathematically driven manner. Instead, the Legislature directed COAH as follows:
In carrying out [its] duties, including, but not limited to, present and prospective need estimations the council shall give appropriate weight to pertinent research studies, government l'eports, decisions of other branches of government, implementation of the State Development and Redevelopment Plan ... and public comment. To assist the council, the State Planning Commission established under that act
*627 shall provide the council annually with economic growth, development and decline projections for each housing region for the next ten years.
[N.J.S.A. 52:27D-307(e)J
The reference to the State Plan is particularly significant because that document divides the state into regions with an eye toward sound planning, in which growth and development are encouraged in areas where infrastructure already exists and discouraged in regions of our state that are environmentally sensitive or in which development would require addition of new infrastructure. The State Plan, moreover, seeks to revitalize cities and urban areas rather than to channel new development in ways that simply create sprawl.
Significantly, as the majority recognizes, see ante at 600-01, 74 A.3d at 905-06, the Growth Share concept was not created by COAH out of whole cloth, but was instead a model developed by one of the state’s preeminent planning experts, see John M. Payne, Remedies for Affordable Housing: From Fair Share to Growth Share, Land Use L. & Zoning Dig., June 1997, at 3, 3. More to the point, it was the creation of a planner who was an advocate for affordable housing, see ante at 600 & n. 5, 74 A.3d at 905-06 & n. 5, and was specifically designed to remedy a series of methodological shortcomings evident to him in the regulations COAH promulgated in the first two rounds, see Payne, supra, Land Use L. & Zoning Dig., June 1997, at 3-6. Growth Share, which was his solution, was designed to be a way to ensure that there would be an adequate supply of low and moderate income housing without abandoning sound planning concepts and without continuing the escalating pattern of sprawl that inevitably followed from the First and Second Round COAH regulations. Id. at 6.
Significantly, in adopting the Growth Share model for use in the Third Round Rules, COAH did not utilize a “pure” Growth Share approach, see ante at 611 n. 15, 74 A.3d at 912 n. 15 (citing Payne, supra, Land Use L. & Zoning Dig., June 1997, at 6-9), because it did not erase the obligations that had been imposed on municipalities in earlier rounds but that had never been satisfied. Instead, those prior, unmet, obligations were retained in the Third Round *628 Rules adopted by COAH. As a result, this Growth Share model, that my colleagues in the majority now reject as being incompatible with the FHA, remained faithful to the statute by honoring the residual effects of prior round obligations on municipalities that this Court had previously deemed constitutional.
The several references in the FHA to regional concerns on which the majority relies are not inconsistent with a Growth Shai’e model. On the contrary, seen in light of the expressed Legislative findings, see N.J.S.A 52.-27D-302, the theory is aligned with the statutory focus on areas in which growth is occurring. The references to regional concerns, at most, would require only that the calculation of a municipality’s fair share be made not only on a state-wide basis, as the Third Round Rules require, but would include a regional component as well.
Therefore, if the majority is correct that the FHA is essentially driven by regional considerations, then it is only in that minute regard that they can conclude that the version of a Growth Share approach embodied in the Third Round Rules is inconsistent with the statute. That is, the Third Round uses a formula that requires growth anywhere in the state to carry with it the same requirement, statistically, for low and moderate income housing, rather than recognizing that different regions of the state, particularly if one considei’s the regions identified by the State Plan, should lead to different requirements for low and moderate income housing.
The majority concludes that the lack of a regional calculation is so inconsistent with the FHA that the Third Round Rules are ultra vires; they conclude that the inconsistency is so significant that there is no possible remedy but to reject these regulations in their entirety in favor of starting over and creating new ones that mirror the prior two rounds. Even if the majority’s analysis of the purported flaw in the Third Round Rules is correct, there is nothing in that relatively minor deviation that demands so drastic a remedy.
*629 II.
That observation, that the remedy imposed by my colleagues is unnecessary, leads to the second basis for my dissent. In short, by demanding that COAH adopt regulations that continue on the path followed over the past thirty years, the majority has impermissibly interfered with the authority that the Legislature vested in that administrative agency and has failed to give COAH the deference that we routinely afford the final decisions of every other administrative agency.
Our case law is replete with examples of our recognition that, where a determination has been made by an administrative agency, our scope of review is both narrow and deferential. See Brady v. Bd. of Review, 152 N.J. 197, 210-11, 704 A.2d 547 (1997); see also Lourdes Med. Ctr. v. Bd. of Review, 197 N.J. 339, 360, 963 A.2d 289 (2009). We have long recognized that when the Legislature has delegated power to an agency, “[t]he grant of authority ... should be liberally construed to enable the agency to accomplish the Legislature’s goals.” Van Dalen v. Washington Twp., 120 N.J. 234, 245, 576 A.2d 819 (1990). When an agency acts in accordance with its delegated power, its actions are “accorded a strong presumption of validity and reasonableness.” Id. at 244-45, 576 A.2d 819.
In creating COAH, the Legislature granted it authority to carry out the statutory directives, including the directive that COAH promulgate regulations in furtherance of the goals expressed in the PHA. N.J.S.A. 52:27D-307.5; see Hills Dev. Co. v. Twp. of Bernards, 103 N.J. 1, 60-61, 510 A.2d 621 (1986). More to the point, as we have held, COAH’s regulations are entitled to an especially deferential standard of review because of that agency’s unique mandate in implementing the FHA and its role in achieving compliance with the Mount Laurel doctrine. See In re Twp. of Warren, 132 N.J. 1, 27, 622 A.2d 1257 (1993) (observing that “principle of judicial deference to agency action is particularly well-suited to our review of administrative regulations adopted by *630 COAH to implement the [FHA]”); Hills Dev. Co., supra, 103 N.J. at 45-46, 510 A.2d 621.
As we have directed in this precise context, “the judiciary, assuming the statutory plan functions reasonably effectively, will be responsive to the actions of the Council and conform its decisions in this field to the Council’s various determinations.” Hills Dev. Co., supra, 103 N.J. at 37, 510 A.2d 621; see id. at 24, 510 A.2d 621 (noting that because legislative and administrative action is preferable to judicial action relating to affordable housing, Legislature is entitled to “particularly strong deference”).
To be sure, we have recognized that, if a regulation that has been promulgated is contrary to the legislative policies that underlie the administrative agency’s enabling statute, or when a regulation “does not comport with [the statute’s] central purpose,” it cannot stand. Twp. of Warren, supra, 132 N.J. at 28, 622 A.2d 1257 (invalidating municipal occupancy preferences as inconsistent with aims of FHA). We likewise have expressed our preference for harmonizing judicial action with COAH’s regulatory determinations, although recognizing that the effort to harmonize cannot be used to justify the “dilution of] COAH’s duty to adopt regulatory methods that are consistent with the statutory goals.” Ibid.; see Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 572-73, 803 A.2d 53 (2002).
Deference to an administrative agency, including COAH, does not extend to arguments that its regulations violate our Constitution. See Abbott v. Burke, 100 N.J. 269, 298-99, 495 A.2d 376 (1985) (“[Ajlthough an agency may base its decision on constitutional considerations, such legal determinations do not receive even a presumption of correctness on appellate review.”). On the contrary, as we have held, “constitutional concerns or the dictates of legislative intent have at times compelled us to decline adoption of doctrines or statutory interpretations that have been favored by [an agency.]” In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 328, 561 A.2d 597 (1989).
*631 That being so, unless this Court can conclude with assurance that the action of the agency was ultra vires, or that its regulation is plainly unconstitutional, we ordinarily stay our hand. See Lourdes, supra, 197 N.J. at 361, 963 A.2d 289. Even when we conclude that regulations fall short, in recognition of the expertise that the agency has in the matter, the more appropriate course, and the one traditionally used in regard to COAH, is to remand to the agency to exercise its discretion as to how to proceed. See, e.g., In re Adoption of N.J.A.C. 5:94 & 5.95, 390 N.J.Super. 1, 87, 914 A.2d 348 (App.Div.), certif. denied, 192 N.J. 71, 926 A.2d 856 (2007); In re Six Month Extension of N.J. A.C. 5:91-1 et seq., 372 N.J.Super. 61, 104-05, 855 A.2d 582 (App.Div.2004), certif. denied, 182 N.J. 630, 868 A.2d 1033 (2005).
Applying these precedents to the matter now before the Court, to the extent that the majority believes that the shortcoming in the Third Round regulations is the lack of a formula with a regional component, the appropriate remedy would be a remand to COAH to make what should be a relatively routine correction. By eschewing that traditional approach and by directing that COAH essentially craft an entirely different regulatory scheme, albeit one based on the methodology embodied in the prior rounds of regulations, the majority has ignored our tradition of deference to agency expertise and has overstepped its authority.
Moreover, in doing so, the majority has failed to recognize the relatively wide scope of authority that the Legislature, through enacting the FHA, has reposed in COAH. Far from being a carefully circumscribed or limited grant of authority, the statute affords much discretion to COAH. See, e.g., N.J.S.A. 52:27D-307 (identifying duties and authority granted to COAH). The majority, however, has ignored that legislative determination and instead has concluded that it is the Legislature that must act, apparently through an amendment to the FHA, if there is to be any departure from the regulatory scheme this Court permitted in the first two rounds. See, e.g., ante at 616, 74 A.3d at 915 (“To sum up, the Legislature has to enact an alternative remedy—such as some *632 version of the one proposed by COAH in the Third Round Rules— in order for that remedy to be statutorily permissible.”).
In taking that stand, the majority has announced that only the Legislature can alter the approach as to how an adequate supply of low and moderate income housing will be achieved. In the process, the majority has removed all discretion from COAH, replacing the scheme that the Legislature enacted with a directive that prevents COAH from innovation of any kind and that serves only to perpetuate the policies that have not truly achieved the goal of ensuring that an adequate supply of affordable housing will be made available for people of all income levels in our state.
As I understand our role, we owe COAH the same deference accorded any other agency when we evaluate its decision or the exercise of its rulemaking authority. Offering no guidance and instead substituting its view of the only statutorily permissible approach, the majority greatly diminishes the likelihood that either COAH or the Legislature will take the initiative for change that the majority intends to encourage. The effect of the demand that the agency adhere to the policies of the past instead will serve as a disincentive to true innovation by the Legislature because, in the absence of guidance from this Court about what approach, other than the one dictated by this Court three decades ago, will be found to be constitutional, that body more likely will continue on the previously approved course.
To the extent that the extensive study and analysis undertaken by COAH in devising the Growth Share approach embodied in the Third Round Rules may be flawed, it is only because the majority remains wedded to the methodologies imposed in the past. To the extent that the majority, in substituting its view of what the FHA demands for the language that the Legislature used, reads the statute to exclude the creative and innovative approach that Growth Share represents, it risks subjecting us to an endless cycle of repeating that which has not worked in the past. To the extent that the majority concludes that the Third Round Rules fall short, the appropriate, and indeed the preferable, remedy would be to *633 identify that shortcoming and permit it to be addressed by the agency that the Legislature created, not to mandate that the agency undertake what is essentially an overhaul of regulations so that they utilize a formula of the majority’s choosing.
Because in my view the Third Round Rules are not inconsistent with the statutory mandates derived from this Court’s decisions in Mount Laurel I and Mount Laurel II, I would reverse the Appellate Division’s direction that we return to the approach used in the First and Second Round.
III.
The majority’s recognition that the dictates of Mount Laurel I and Mount Laurel II are not the only constitutionally permissible methods for achieving the provision of adequate low and moderate income housing is a conclusion with which I agree. To the extent, however, that the majority concludes that the Third Round Rules adopted by COAH are so flawed that they must be replaced with the approach utilized in the past, I respectfully dissent.
For affirmance a,s modified—Justices LaVECCHIA, ALBIN, and Judge RODRÍGUEZ (temporarily assigned)—3.
For reversal—Justices HOENS and PATTERSON—2.
Not participating—Chief Justice RABNER and Judge CUFF (temporarily assigned)—2.