DECISION
This matter is before the Court on Petitioner State of Rhode Island, Department of Corrections' ("Employer") appeal of the July 7, 2005 Rhode Island State Labor Relations Board ("Board") decision. In its decision, the Board found that Employer committed an unfair labor practice ("ULP") when it unilaterally amended the job specifications for several positions without first bargaining with the Rhode Island Brotherhood of Correctional Officers ("Union"). Jurisdiction is pursuant to G.L. 1956 § 42-35-15. For the reasons set forth below, the Board's decision is affirmed.
 Facts and Travel
The Department of Corrections has amongst its job classifications two positions at issue here: "Security Specialists" and "Maintenance Superintendents." Several employees in both of these positions belong to the Union, which has entered into a Collective Bargaining Agreement ("CBA") with the Employer.
In 1999, before the accretion of the bargaining unit, Security Specialist James Bailey submitted a proposed revised job description for the position of Security Specialist, as well as a request for a public hearing, to Michael Frost, the Chief of Security at the Department of Corrections. (Employer's Exhibit 1.) Nothing apparently developed from this request until November 6, 2001, when George Truman, Associate Director of Human Services, wrote to Bailey and stated that he had met with Union[1] representatives regarding a pay increase for the security specialists and that he would present those figures to the Director of Corrections. (Employer's Exhibit 2.) Within that letter, Truman also indicated that he would follow up with the State Classification Division concerning job specifications and that "as further developments arise, I will be advising [Union] President Ferruccio." Id.
Pertaining to the Maintenance Superintendent positions, one year prior to drafting his November 6, 2001 letter, Truman had inquired of Ronald P. Clare, the Deputy Personnel Administrator, what the appropriate process was for commencing revision of job specifications for various positions within the "maintenance hierarchy." (Employer's Exhibit 3.) Furthermore, Kenneth Rivard, grievance chairman for the Union, testified that he had had several discussions with Truman, who indicated that Employer was going to discuss the issues during negotiations. (Tr. at 14.) However, according to Rivard, these negotiations never occurred.
On December 27, 2002, the State of Rhode Island conducted a public hearing in its effort to change the job specifications for Security Specialists and Maintenance Superintendents. The Union was not present at this hearing, as according to Union President Richard Ferruccio, the Union was not notified in a timely fashion that the hearing was to occur, and by the time it received notice, it was too late to attend.[2] As a result of this hearing, the job specifications were significantly altered, with each position having additional qualifications and duties being added to the specifications.
On January 30, after the amended job specifications were approved, the Union filed with the Board an ULP charge against the Employer, alleging that by amending the job specifications without first negotiating the changes with the Union, the Employer had violated G.L. 1956 § 28-7-13 (6) and (10). In response to the charge, the Board issued its complaint on March 19, 2003. Thereafter, on May 6, 2003 the Board held a formal hearing on the matter, at which time each party presented documents and witnesses. The Board issued its Decision on July 7, 2005 and concluded that "The Union has proven by a fair preponderance of the credible evidence that the Employer has committed a violation of R.I.G.L. 28-7-13 (6) and (10)." Employer was ordered to cease and desist from submitting changes to existing job specifications to the Department of Administration without first negotiating with the certified bargaining representative. Employer was also directed to cease and desist from requiring employees to perform any jobs that were added by the revised job specifications until those changes were bargained with the Union. Further, the Board ordered Employer to post a copy of the Board's decision for thirty days on all bulletin boards utilized by the Employer for employee notices.
The Employer subsequently filed a timely "Motion to Stay Enforcement of the Administrative Order," which was granted on July 25, 2005. The Employer also filed a Complaint in the Nature of a Petitioner for Review, appealing the Board's decision. Employer's appeal is now before this Court for decision.
 Standard of Review
The Superior Court's judicial review of a contested Board decision is governed by the Administrative Procedures Act, §42-35-15(g), which provides as follows:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Under the terms of this statute, the reviewing Court is precluded from substituting its judgment on questions of fact for that of the agency. Lemoine v. Dep't of Public Health,113 R.I. 285, 291, 320 A.2d 611, 614-15 (1974). This is true even in those cases where the Court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the Board. Berberian v. Dep't of Employment Sec., 414 A.2d 480,482 (R.I. 1980). On appeal, judicial review by the Court is limited to an examination and consideration of the record to determine whether there is any legally competent evidence therein to support the Board's decision. Barrington Sch. Comm. v. R.I.State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992). If there is any such evidence, the Court is required to uphold the agency's factual determinations. Blue Cross and Blue Shield v.Caldarone, 520 A.2d 969, 972 (R.I. 1987). However, the Court is not bound by the findings or conclusions made by the agency if they are totally devoid of competent evidentiary support in the record or by the reasonable inferences that can be drawn therefrom. Milardo v. Coastal Resources Mgmt. Council,434 A.2d 266, 270 (R.I. 1981). Furthermore, unlike questions of fact, agency decisions on questions of law are not binding upon the Court and may be reviewed by the Court to determine the law and its applicability to the facts. Narragansett Wire Co. v.Norberg, 118 R.I. 596, 607, 376 A.2d 1, 6 (1977).
 Analysis Obligation to Bargain
A. Statutory authority
Employer first argues that the Board's decision was clearly erroneous as a matter of law because Employer has the statutory authority to amend job specifications without engaging in prior negotiations with the Union. According to the Employer, there is no duty to bargain with the Union over a provision which is covered by statute, and as amending job specifications is a duty statutorily prescribed to management, Employer did not have to bargain with the Union.
This Court agrees with Employer that an employment provision statutorily required cannot be the subject of collective bargaining. State v. R.I. Alliance of Social Servs. Employees,Local 580, SEIU, 747 A.2d 465, 468 (R.I. 2000) ("[A] valid employment requirement prescribed by state law cannot be negotiated and is not a proper subject for arbitration.") However, this Court finds that the Board did not err when it concluded that Employer had a duty to bargain with the Union on changes to the job specifications.
i. G.L. 1956 § 42-56-10
The first provision to which Employer cites in support of its position that it had no duty to bargain is G.L. 1956 § 42-56-10. That section enumerates the powers the General Assembly has conferred upon the Director of the Department of Corrections. In part, the Director shall:
 "(2) Maintain security, safety, and order at all state correctional facilities, utilize the resources of the department to prevent escapes from any state correctional facility, take all necessary precautions to prevent the occurrence or spread of any disorder, riot, or insurrection of any state correctional facility, including but not limited to the development, planning, and coordination or emergency riot procedures, and take suitable measures for the restoration of order;
 (3) Establish and enforce standards for all state correctional facilities; . . .
 (5) Manage, direct, and supervise the operations of the department;
 (6) Direct employees in the performance of their official duties;
 (7) Hire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action;
 (8) Maintain the efficiency of the operations of the department;
 (9) Determine the methods, means, and personnel by which those operations of the department are to be conducted; . . .
 (14) Establish training programs for employees of the department;
 . . .
 (22) Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties, including, but not limited to, rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication, and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities." Sec. 42-56-10.
According to Employer, because the General Assembly has empowered the Director of the Department of Corrections to direct employees in the operation of their duties, to determine the methods by which operations are conducted, and to set standards for the correctional facilities, it follows that Employer has the statutory authority to amend the content of job specifications; consequently, the Employer maintains as such power is given to Employer directly by the General Assembly, the content of job specifications is a subject which cannot be bargained.
However, this Court finds that Employer misconstrues § 42-56-10
and that the Board was not without legal justification when it concluded that Employer had a duty to bargain over job specification. Employer's powers and duties are not governed solely by § 42-56-10; rather, Employer also has a duty to follow the mandates of § 36-11-1. That section provides that "[t]he representatives of state employees are hereby granted the right to negotiate with the chief executive or his or her designee (appointed, elected, or possessing classified status) on matterspertaining to wages, hours, and working conditions." (Emphasis added.) Sec. 36-11-1(b).
In determining what constitutes "matters pertaining to wages, hours, and working conditions," the Board turned to federal guidance for its finding that working conditions are directly impacted by job descriptions/job specifications. For instance, the Board relied on a National Labor Relations Board holding that "it is clear under the precedent that written job descriptions covering employees in the appropriate bargaining unit constitute conditions of employment within `wages, hours, and other terms of employment' recognized traditionally as constituting mandatory subjects of bargaining." Bloomsburg Craftsmen, Inc. v.Bloomsburg Printing and Graphic Communications Local 732,
276 N.L.R.B. 400, 404 (1985) (citing NLRB v. The Borg-Warner Corp.,356 U.S. 342 (1958)). Logically, job descriptions affect working conditions because the specifications list what the employees are required to do on a daily basis. An employee's required daily duties in turn affect the wage employees are entitled to for those enumerated duties. See Beverly Health and RehabilitationServices, Inc., 332 N.L.R.B. 347, 359 (2000) ("Unilaterally issuing new job descriptions to union represented employees violates Section (a)(5) of the Act. . . . [T]he very assignment of those duties and responsibilities on employees affects terms and conditions of employment.")
Employer argues, though, that the Board erred by relying upon the cases to which it cited. Primarily, Employer claims that the Board should not have relied upon those cases as they involved claims arising under the National Labor Relations Act ("NLRA"). The Employer argues that because the NLRA is inapplicable to states, cases based upon that Act should not be looked to for guidance. See 29 U.S.C. § 152 (2) ("The term `employer' . . . shall not include . . . any State or political subdivision thereof.") This State, however, has often looked to the federal courts for guidance when the State courts are silent on an issue, particularly matters involving labor disputes. See Belanger v.Matteson, 115 R.I. 332, 337-38, 346 A.2d 124, 129 (1975). The fact that the State is not an "employer" under the NLRA and could not be a party to an action brought under that Act does not necessarily preclude the Board from examining NLRB decisions to aid its interpretation of what constitutes "matters pertaining to wages, hours, and other terms of employment." Similarly, the Employer argues that it was legally erroneous to rely on the above decisions as they are factually distinct from the matter here. Again, though, the Board did not recognize those federal cases as binding precedent or as creating an obligation for the state to follow the NLRA. Instead, those cases, while factually distinct, can be used by the Board to help interpret the nearly identical language of § 36-11-1 that is found in the NLRA.[3] See 29 U.S.C. § 151 (1994) ("Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury . . . by encouraging practices fundamental to the friendly adjustment of . . . disputes arising out of differences as towages, hours, or other working conditions. . . .)
Consequently, the Board did not err when it concluded that the Employer has an obligation to bargain with the Union on changes to job specifications. Employer's reliance on § 42-56-10, therefore, is misplaced. There is no express provision within that statute that provides Employer with the power to unilaterally amend job specifications and descriptions. On the other hand, the Board could interpret § 36-11-1 to conclude that job specifications have a direct impact on working conditions and wages. Accordingly, as matters pertaining to working conditions and wages are matters subject to bargaining pursuant to §36-11-1, a duty to bargain that does not conflict with any of its powers provided in § 42-56-10 was imposed upon the Employer. The two statutes can be read harmoniously, and accordingly, the Board's decision is not affected by legal error and will not be reversed on this ground. See Providence Worcester RailroadCo. v. Pine, 729 A.2d 202, 208 (R.I. 1999) (Statutes should be considered "as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.")
ii) Merit System: § 36-4-1 et. seq.
Employer also asserts that it had the authority to unilaterally propose amendments to the job specifications pursuant to the statutorily mandated "Merit System" of G.L. 1956 § 36-4-1 et. seq. Under the Rhode Island Merit System, the Personnel Administrator has the authority and responsibility for classifying each position within the state. Section 36-4-9
provides:
 "The personnel administrator, shall, after consultation with appointing authorities and principal supervising officials, classify all of the positions in the classified service according to the duties and responsibilities of each position. The plan of classification shall designate an appropriate title for each class of position and shall indicate the education, experience, capacity, knowledge, skill, and other qualifications to be required of persons appointed to positions in each class. The complete classification plan shall be so arranged that . . . the same pay schedules can be made to apply with equity under like working conditions."
Further, the Merit System provides that "[a]dditional classes may be established and existing classes may be divided, combined, altered, or abolished upon recommendation of the personnel administrator; recommendation by the director after public hearing; and approval by the governor." Sec. 36-4-10.
The Employer contends that it followed the statutory requirements of the Merit System. It recommended its proposals to the Personnel Administrator as the statutes require, and therefore, Employer argues that it could not have committed an ULP. Additionally, Employer asserts that the Board decision cannot stand as it requires Employer to act in contravention of this statutory scheme, and the Board cannot render a decision ordering a party to act in a manner inconsistent to the Merit System. Rhode Island v. Rhode Island Alliance of Social ServiceEmployees, Local 580, SEIU, 747 A.2d 465 (R.I. 2000).
The Union does not challenge the statutory authority empowering the Department of Administration as the entity responsible for classification issues. Further, the Union apparently recognizes that "neither a department of state government nor a union of its employees . . . can agree to relieve the parties to a CBA of their obligation to comply with applicable state law." Id. at 469. However, the Union does not believe that the Board's decision "conflict[s] with or compromise the statutory authority or legal obligations of a department of state government." Id.
at 468. Instead, the Union contends that the Board's decision merely reflects a balance between the Merit System and the Collective Bargaining System.
The Supreme Court of Rhode Island has recognized that "[t]he relationship between collective bargaining of public employees and existing civil-service or merit-system laws often can be complex." R.I. Brotherhood of Correctional Officers v. RhodeIsland, 643 A.2d 817, 820 (R.I. 1994). However, the "wise and proper course is to accommodate the two systems where possible in order to give full effect to the intent of the Legislature in providing for these two systems of public-employee relations."Id. at 821. Consequently, "[t]he merit-system structure and the collective-bargaining structure should be so interpreted that both may coexist in harmony." Id.
Applying the above principles to the matter here, this Court finds that the Board's decision effectuates the legislative intent for both systems, so that both co-exist peacefully without infringing upon one another. In rendering its decision, the Board specifically attempted to harmonize the two statutory procedures. It concluded: "The two systems can be harmonized . . . by having the parties negotiate and reach agreement on new classifications or revised job specifications and then employing the merit system procedural process or public hearing and submission to the governor." In other words, the Board's decision does not interfere with Employer's role in the Merit System: Employer still retains the authority to submit proposals for changes in job classifications to the Department of Administration. Prior to taking that step, however, the Employer is obligated to bargain in good faith with the Union on changes to the job specifications. Thus, the Board has accommodated Employer's roles in both the Merit System and Collective Bargaining System. Accordingly, this Court holds that the Board's decision is not affected by error of law and that it properly struck an appropriate balance between the two statutory systems.
B. Contractual rights
Employer next argues that it has various contractual rights which provide it with the power to unilaterally change job specifications, and thus, no ULP occurred. Preliminarily, this Court notes that the CBA is not part of the record, as it was not entered as an exhibit before the Board. Accordingly, in its brief, Employer requested this Court to take judicial notice of the CBA. (Employer's Brief at n. 9) (". . . it is requested that the Court take judicial notice of the RIBCO contract."))
In Rhode Island, judicial notice is governed by Rhode Island Rule of Evidence 201, which is based upon Federal Rule of Evidence 201. General Law 1956 § 42-35-10 requires that in administrative proceedings, "[t]he rules of evidence as applied in civil cases in the superior courts of this state shall be followed." Rule 201 provides in pertinent part:
 "(a) Scope of Rule. This rule governs only judicial notice of adjudicative facts.
 (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 (c) When Discretionary. A court may take judicial notice, whether requested or not.
 (d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information. . . .
 (f) Time of Taking Notice. Judicial notice may be taken at any stage of the proceeding . . ."
While Rule 201(f) allows the Court to take judicial notice at any stage of the proceeding, in interpreting this Rule, other courts have found that "[w]here the issue of judicial notice is raised for the first time on appeal, the appellate court is faced with a conflict between the policy that decisions ought not to run contrary to indisputable facts and the procedural policy that prohibits a party from raising issues on appeal that were not raised below." Mel Trimble Real Estate v. Monte VistaRanch, Inc., 758 P.2d 451, 456 (UT 1988) (citing 21 Charles Alan Wright Kenneth W. Graham, Jr., Federal Practice and Procedure
§ 5110 (1st ed. 1977); People v. Bush, 37 Cal. App. 3d 952,112 Cal. Rptr. 770 (1974)). Recognizing this dilemma, the court inMel Trimble held that the "better interpretation limitsmandatory judicial notice to the trial courts." Id. In other words, the court would not take notice for the first time on appeal of a matter not noticed below in order to permit a party to assert a legal theory not presented to the trial court.
There exists a strong policy against allowing a party to present evidence for the first time on appeal. Courts and commentators appear to agree that if Rule 201 is interpreted as allowing judicial notice to be taken for the first time on appeal, when notice was not requested below, the traditional standard of review will be eviscerated. See 21B Charles Alan Wright Kenneth W. Graham, Jr., Federal Practice and Procedure
§ 5110.1 (2d ed. 2005) ("Courts agree with the writers who argue that the appellate court should not take judicial notice to cure an insufficiency of evidence in the record. One can easily find a great many cases in which the appellate courts declined to take judicial notice for the first time on appeal.") In the context of administrative appeals, a reviewing court is not to substitute findings of fact for those of the agency; yet, this could hardly be avoided if the court on appeal were permitted to examine evidence that was not made available, or requested to be made available, to the agency. One appellate court attempted to balance this problem by holding: "[A] reviewing court may take judicial notice of facts or events not appearing in the record, which disclose no actual controversy exists between adverse parties. . . . However, a reviewing court will not take judicial notice of critical evidentiary material not presented in the court below, especially where the evidence may be significant in the proper determination of issues between the parties." Kennedyv. Edgar, 199 Ill. App. 3d 138, 143 (1990).[4] Likewise, the Supreme Court of Wyoming has also held that while judicial notice may be taken on appeal, "it should not . . . be invoked to relieve parties of their duty to present adequate evidence at the trial except in the most extreme cases in which the failure to take judicial notice would be akin to plain error." 37 GamblingDevices v. Wyoming, 694 P.2d 711, 716 (Wyo. 1985).[5]
When requesting this Court to take judicial notice, Employer directed the Court to Hooper v. Goldstein, 104 R.I. 32,241 A.2d 809 (R.I. 1968). In Hooper, the Supreme Court of Rhode Island held that the court "although ordinarily confined to the record on appeal, [is permitted] to take judicial notice of those ordinances or regulations which an inferior tribunal of original jurisdiction may have properly noticed." Id. at 37,241 A.2d at 812. Employer analogizes the CBA as a legal document akin to the regulations in Hooper that while not part of the record below, should be judicially noticed here on appeal.
Hooper is distinguishable from the matter here. The Hooper
Court permitted judicial notice of regulations and municipal ordinances by the entity that promulgated those rules. Id. at 812. The Court held that "[i]n each instance, recognition may be taken because the tribunal stands in a peculiar relationship to the ordinance or regulation which it officially notices." Id.
Here, however, there existed no such special relationship between the Board and the CBA. In fact, Hooper seems to be limited to its circumstances, as the Rhode Island Supreme Court has held that judicial notice will not permit one municipality to take judicial notice of the specific provisions of another municipality's ordinances. Lincoln v. Cournoyer, 95 R.I. 280,284, 186 A.2d 728, 730 (1962) ("It is generally held that the doctrine of judicial notice will not be extended to the enactment of specific municipal ordinances or to the specific provisions of such municipal ordinances."); see also, Getty PetroleumMarketing, Inc. v. Capital Terminal Co., 391 F.3d 312, 320 (1st Cir. 2004) ("Under traditional rules, even a municipal ordinance must be put into evidence.")
Judicial notice should not be used to rescue a party who has failed to produce sufficient evidence at trial. See Melong v.Micronesian Claims Comm'n, 643 F.2d 10, 12 n. 5 (D.C. Cir. 1980). Here, Employer had ample opportunity to introduce the CBA as an exhibit, yet failed to do so. On review, the Court is to examine the record to determine if the Board was clearly erroneous in light of the evidence in the entire record. Thus, this Court cannot now hold that the Board erred because of the provisions in a document that were neither presented to the Board nor made part of the record.[6] Consequently, this Court shall not address the issues Employer has raised that arise out of the specific terms of the contract.
 ULP as Applied to the Facts
Employer next argues that the Board's decision is clearly erroneous in view of the substantial evidence on the whole record because no ULP occurred under the facts here. Specifically, Employer asserts that the updates made to the job specifications for the Security Specialist and the Maintenance Supervisor positions did not impose any new requirements upon the employees and simply reflected the current actual duties of those positions. Furthermore, Employer maintains that the pre-amended job specifications contained the words "related work as required" and consequently, the amended job specifications cannot be interpreted as creating additional duties and responsibilities that affect working conditions. Moreover, Employer, in support of its assertion that there was no ULP here, points to the fact that the revised specifications were based on drafts created by Union members.
Essentially, Employer is arguing that because no additional duties beyond those the employees are presently performing have been added to the job specifications, working conditions have not changed and therefore, Employer had no obligation to bargain over the specifications. However, this argument fails for several reasons. First, the Board found that the amended specifications did impose new duties and requirements above and beyond those listed in the original specifications, and that "both positions were altered significantly." Second, and more importantly to the issue here, the amended specifications contained additionalqualifications that were not required by the prior specifications. In making its findings of fact, the Board expressly adopted the summary of changes presented in the Union's brief, which demonstrates that additional duties and qualifications were placed in the job specifications, beyond what had previously been required. For example, as they pertain to Security Specialists, several qualifications were added, including a thorough knowledge of alarm systems and video surveillance, a working knowledge of drug policies, and experience in the development and implementation of sophisticated security systems. (Union's Exhibit 3B.) Moreover, additional qualifications and requirements were added to the Maintenance Superintendent specifications. Under the revised specifications, Maintenance Superintendents are now required, amongst other things, to have a working knowledge of direct digital computer based micro-processing operating systems and a working knowledge of electrical implementation.[7] (Union's Exhibit 2B.) While the Union members undoubtedly had been performing some of the duties added in the revised specifications, the amended specifications are more than just a recitation of existing job duties; instead, they included higher qualifications and experience. Consequently, several of the employees would no longer qualify for the positions in which they are currently employed (Tr. at 39.) Clearly, therefore, the working conditions were affected by the revised job specification, imparting upon Employer an obligation to bargain.
Similarly, while the job specifications might not have necessarily altered the daily activities that the members were currently performing, job specifications have an impact on the salary to which union members are entitled. Even if Union members were already doing some of the same tasks, they would not necessarily be entitled to a corresponding wage; instead pay raises are directly impacted by what is listed in the job specifications. (Tr. at 16) ("The more-in depth the job specs are, the duties and responsibilities are, obviously that affects wages.") Consequently, as employer had a duty to bargain on matters relating to wages, and job specifications impact wages, the Board's concluding that Employer committed an ULP under the facts here was not clearly erroneous or affected by error of law.[8]
 Failure to Request Negotiations
Employer further argues that the Board's decision is based upon legal error because even if Employer had a duty to bargain with the Union, the Union waived this right to negotiate by failing to request negotiations. Consequently, by failing to request to bargain, Employer asserts that Union cannot now claim that it was unlawfully denied any right it may have had to negotiate.
Federal case law indicates that when a bargaining unit is apprised with knowledge and notice of management's intention to implement changes which the bargaining unit believes require negotiation, the bargaining unit is required to request negotiation; otherwise, objection to management's unilateral action is waived. See National Labor Relations Bd. v. OklahomaFixture Co., 79 F.3d 1030, 1036-37 (10th Cir. 1996) ("Once the company provides appropriate notice to the Union, the onus is on the Union to request bargaining over subjects of concern.");YHA, Inc. v. National Labor Relations Bd., 2 F.3d 168, 173 (6th Cir. 1993) ("When an employer gives notice of a proposed change in terms and conditions of employment, the union must act with due diligence in requesting bargaining.") Implicit in all of these decisions is that the Union first has to be provided with sufficient notice of the proposed management action so that the failure to request bargaining is a conscious decision and tactical choice. As the United States Court of Appeals for the Sixth Circuit has held:
 "Waiver will be found if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. The Board requires proof of clear and unequivocal notice such that Union's subsequent failure to demand bargaining constitutes a `conscious relinquishment' of the right to bargain." YHA, Inc., 2 F.3d at 173.
Accordingly, a union's failure to request negotiations will only be treated as a waiver of bargaining rights if the union first had a meaningful opportunity to bargain. See Penntech Papers,Inc. v. National Labor Relations Bd., 706 F.2d 18, 26 (1st Cir. 1983) ("A concomitant element of `meaningful' bargaining is timely notice to the union . . . so that good faith bargaining does not become futile or impossible.")
Employer asserts that the Union did indeed have sufficient knowledge of the proposed changes to the job specifications to the extent that it was required to request negotiations or otherwise waive any such rights to bargain which it may hold. In support of this assertion, Employer places heavy emphasis on the testimony of Rivard and Truman that the two men had discussions with one another prior to the December 27, 2002 hearing. (Tr. at 14, 88.) Further, Employer claims that the job specifications were drafted by the Union, and consequently the Union cannot claim that it did not have knowledge of Employer's plan to change the specifications. (Employer's Brief at 22 (citing Tr. at 39, 59).) Employer, however, fails to take into consideration other evidence that was before the Board and misconstrues the amount of knowledge that the Union possessed. For example, while Truman and Rivard did engage in discussions, Rivard had no knowledge that Employer was planning to move forward and implement the changes without pursuing formal bargaining, and indeed, Rivard was under the belief that negotiations would take place before anything further would transpire. Rivard testified:
 "I had spoke to George Truman on a couple of different occasions, and he had indicated to me that the Department was going to look into basically for him to get the okay to go ahead with any proposals, discussions, and negotiations on upgrades. I believe he said they were also looking at some other titles, and essentially we never got into negotiation on the specs. He had proposed — basically indicated to me that this issue would be discussed during negotiations." (Tr. at 14.)
In other words, while Rivard may have had talks with Truman, he was unaware that Employer was planning to take any action without first negotiating.
Additionally, the Board found that the Union did not receive actual notice of the December 27, 2005 hearing, at which the changes were proposed, until the very morning of that hearing. The Board found credible Ferruccio's testimony that he was not informed of the hearing until the very morning the hearing occurred, and that given the short notice, the Union was unable to timely prepare an objection. (Tr. at 21.) The Board also determined that on November 6, 2001 Truman had drafted a letter in which he stated that as further developments arose regarding job specifications, he would first advise President Ferruccio. (Employer's Exhibit 2.) In essence, the Board found that the Union did not have notice that the hearing was going to take place and that Employer was attempting to unilaterally alter the job specifications. The evidence before the Board indicated that the Union was not aware that any changes were going to be made, and if Employer wanted to change the specifications, notice would first be provided, at which point the parties could engage in negotiations. The Board implicitly found that such notice was not provided. "Whether an employer has provided meaningful and timely notice is essentially a question of fact, and the Board's findings in this regard are to be accepted if supported by substantial evidence." Oklahoma Fixture Company,79 F.3d at 1035 (citing National Labor relations Board v. Emsing'sSupermarket, 872 F.2d 1279, 1287 (7th Cir. 1989)). As substantial evidence supports the Board's finding that there was insufficient notice provided to the Union, and as meaningful notice is required, the Union did not waive its right to object to Employer's failure to bargain by failing to request negotiations.
 Employer's Motion to Dismiss
Employer next asserts that because the Board did not issue a ruling regarding Employer's motion to dismiss, the Board's decision on review here was based upon unlawful procedure and must be reversed. This Court disagrees.
The Board's Rules and Regulations permit a party to orally introduce a motion at hearing. Rule 7.04.3 states that "All motions made at or during the pendency of a hearing, except motions hereinafter specifically required at all times to be made to the Board, shall be stated orally, shall be included in the stenographic report of the hearing, and shall be decided by the Board in due course. . . ." At the hearing in this dispute, Employer orally requested the Board to dismiss the charges:
 "[Employer]: Wherefore the State requests the Board dismiss this matter as unfounded . . .
 [Board]: Is that in the form of a motion?
 [Employer]: Yes.
 [Board]: The Board will rule on that motion before it decides the case." (Tr. at 11.)
Thus, Employer made an oral motion to dismiss as is permitted by the Labor Relations Board's Rules and Regulations. The Board heard this motion, took it under consideration, and stated that it would rule upon the motion before deciding the case. Employer insists that the Board did not rule on the motion as it stated and as is required by the Rules and consequently, the decision must be overturned as it is affected by procedural error.
There does not appear in the record any written ruling on Employer's motion to dismiss. Nor do there appear in the transcript any oral statements from the Board regarding its decision on the motion. The Board, however, never stated that it would issue a written ruling regarding a Rule 7.04-3 motion, and no such requirement appears in the Board's Rules and Regulations. Further, the Board never indicated that it would orally explain the basis of its ruling on the motion to dismiss. The Board simply stated that it would "rule" on the matter before decision. Rule 7.04.3 only requires that the motion shall be "decided" by the Board: the Rules and Regulations do not require the ruling to be in any particular form.
Consequently, this Court finds that the Board implicitly ruled on the motion by deciding the case and rendering a decision on the merits. If the Board had granted Employer's motion, it would not have proceeded to issue its decision. Instead, the Board implicitly denied the motion and found that decision should be rendered on the merits. The Board's choice to issue a written decision on the substance of the charges is behavior that constitutes a denial of the motion. Furthermore, the record does not evidence that Employer was substantially prejudiced by the Board's failure to explicitly state its ruling. Contra EastGreenwich Yacht Club v. Coastal Resources Mgmt. Council,118 R.I. 559, 569, 376 A.2d 682, 687 (1977) (Board must, however, issue written findings of fact to make review possible.) Employer had full opportunity to present its arguments on both its motion and on the substantive merits of its case. Accordingly, the Board's not issuing a written decision on the motion to dismiss was not in violation of statutory provisions and substantial rights of the Employer were not prejudiced.
 Public Policy
Additionally, Employer argues that public policy dictates that this Court should overturn the Board's decision. If the Board's decision is to stand, Employer insists that it would not be able to maintain the security, safety, and order of the state correctional facilities. For instance, Employer explains that the Security Specialists would be unable to perform inmate drug testing, as such is not a job requirement in the original specifications. Further, pursuant to the Board's decision, Employer maintains that the Maintenance Superintendents would not have to remain updated on recent developments in technology. Accordingly, the safety of the guards, inmates, and citizens of the state would be compromised if the Union members were not required to perform the tasks required in the amended specifications. Thus, in light of the harm that could potentially ensue were the Board affirmed, Employer insists that the Court should reverse the Board if for no other reason than for the safety of the public.
This Court does recognize that there is the potential for problems to arise if the Union members are not required to maintain updated knowledge on technological advances in security equipment and procedures. However, this problem can be avoided through the process of collective bargaining and negotiation. Employer can address its concerns about the safety issues that may result if the old job specifications remain in tact by attempting to amend the job specifications through the proper process. In other words, the Board's decision does not dictate that the job specifications can never be updated, only that the Employer must first attempt to bargain in good faith with the Union.
Furthermore, in addition to the policy consideration propounded by Employer, there exist countervailing policy concerns regarding employer/employee relations. The purpose of labor law in general is to "create a climate wherein the parties find it mutually advantageous to resolve problems through discussion and negotiation." Norwich v. Norwich Fire Fighters, 173 Conn. 210,219, 377 A.2d 290, 295 (1977). Peace is fostered by compelling negotiations, and labor laws promote the orderly and constructive relationship between public employer and employee so that necessary harmony is achieved. See Caldwell-West CaldwellEducation Ass'n v. Caldwell-West Cladwell Bd. of Education,180 N.J. Super. 440, 448, 435 A.2d 562, 567 (App.Div. 1981); AlbertEinstein Medical Center v. Pennsylvania Labor Relations Bd.,15 Pa. Commw. 532, 541,328 A.2d 539, 540 (Pa.Commw.Ct. 1974). Here, were this Court to reverse the Board's decision, Employer would be given the power to change the job specifications without having to respect the employees' rights to negotiation. The legislative intent of fostering peace between employee and employer is advanced by affirming the Board. Moreover, by affirming the Board's decision, employees' rights are protected, a laudable policy concern. Consequently, the Board's decision does not violate statutory provisions and was not made in excess of the statutory authority of the agency.
 Conclusion
After review of the entire record, the Court finds that the Board's decision is supported by reliable, probative and substantial evidence in the record. Substantial rights of the Employer have not been prejudiced. Accordingly, the July 7, 2005 decision of the Labor Relations Board is hereby affirmed.
[1] At this point, the Security Specialists had already been accreted to the Union as of February 2001.
[2] Ferruccio testified that he did not learn of the hearing until the very morning the hearing took place. (Tr. at 21.)
[3] Even if it was erroneous to rely on the above federal cases as interpretive guides, Employer has not pointed to contrary binding authority that job descriptions are not matters pertaining to working conditions. While Employer does cite toInternational Federation of Professional and Technical EngineerLocal No. 1, 52 F.L.R.A. 1341 (1997), that case is distinguishable from the matter here. There the Court simply found that "the title, series and grade of the position . . . is not within the duty to bargain." Id. The Court did not reach a conclusion on whether job descriptions/job specifications, the matter presently at issue, were negotiable.
Furthermore, the Board heard testimony regarding how changes to job specifications affect working conditions and wages. For example, Kenneth Rivard testified as follows: "Obviously, the job specs reflect on pay grade wages. The more in-depth the job specs are, the duties and responsibilities are, obviously that affects wages." (Tr. at 16.) Rivard further went on to state that "if there's more educational requirements required, then obviously that would reflect in the pay grade." (Tr. at 17.) Thus, the Board received information that job descriptions have an impact on wages and working conditions.
[4] Similarly, the Court of Appeal of Texas held that "[a]lthough we may take judicial notice for the first time on appeal of facts which the trial court should have been authorized to notice . . . we are reluctant to take judicial notice when the trial court was not requested to do so and was not given the opportunity to examine the source material." Hollingsworth v.King, 810 S.W.2d 772, 774 (1991).
[5] The Supreme Court of Wyoming engaged in further analysis, reasoning as follows:
 "If [Rule 201] . . . is read literally it requires the taking of judicial notice upon appeal when request is made and the necessary information is supplied. That construction of the rule would infringe upon basic principles which underly the appellate process and which require the timely presentation of objections and offers of proof to the trial court in order to preserve errors on rulings on evidentiary matters for review. . . . We will not adopt such an interpretation. We construe our Rule 201(d) to require, in the absence of plain error, the taking of judicial notice on appeal only when timely request has been made to the trial court and the necessary information made a part of the record on appeal." Id. at 716-17.
[6] In fact, commentators have stated that "courts are more likely to take judicial notice for [affirming the trial court] than for the purpose of reversing the trial court." Wright 
Graham, supra, § 5110.1 (citing 1 Cleckley, Handbook on Evidence for West Virginia Lawyers, 3d ed. 1994 p. 142).
[7] In regards to education and experience, the revised specifications imposed a requirement of graduation from high school or completion of at least two years of trade school in areas involving building maintenance and repair and three to five years employment in a supervisory position. The required education and experience could also be satisfied by other substantially equivalent education and experience. (Union's Exhibit 2B.)
[8] Furthermore, even if the amended job specifications did not add any new duties that the Union members were not already performing, any amendment to the job specifications could potentially affect working conditions. Consequently, even if the daily duties were not changed, the working conditions and related items could potentially change; thus, because of this potential for change when any job specifications are amended, Employer has a duty to, at minimum, bargain and negotiate over the amendments.